## J. A. STEWART *v.* LEE MUTUAL FIRE INSURANCE ASSOCIATION ET AL.

1. MUTUAL FIRE INSURANCE ASSOCIATION. *Contract with. Power of directors to vary.*

    The entire management of the " Lee Mutual Fire Insurance Association" was by its charter placed in the hands of a board of directors. The association accepted members on the payment of certain fees, assessments, and dues, and issued to them policies of insurance, by which it was agreed that on the destruction by fire of the property insured the association would order and collect an assessment from every other policy-holder for the benefit of him whose property was burned. .*Held,* that the contract could not be varied by the directors by means of a by-law, so as to put an assured in a particular class which called for an assessment only on the policy-holders of that class, unless the assured knew of and assented to such by-law.

2. SAME. *Failure of officers of to levy assessment. Liability of company.*

    And in such case if the directors fail or refuse to levy an assessment as provided for in the policy, the association is liable in damages to the full extent of the policy-holder's rights, although the directors honestly believe that they could only be required by law to make the levy provided for in the by-law referred to.

3. SAME. *Misappropriation of funds. Liability of directors.*

    And if the directors of such insurance association have divided among themselves and other incorporators and paid out for taxes and attorneys' fees certain funds which ought to be applied to the payment of losses by policy-holders, they are personally liable to a policy-holder having a good claim for loss against the association, though the misapplication of funds was made in good faith.

4. SAME. *Liability of officers for misappropriations of funds.*

    But officers of such association, whose duties are executive and who are subject to the direction and control of the directors are not liable for such misappropriation of funds, if they have simply performed their duties as directed.

5. SAME. *Liability of officers and corporators for loss by a bank failure.*

    Nor are the officers of such association or the incorporators thereof liable for money deposited in a bank and lost by its failure, if the officers acted, in reference to such deposit, in good faith, as prudent men generally acted in the same community.

APPEAL from the Chancery Court of Lee County.

HON. BAXTER MCFARLAND, Chancellor.

On April 20, 1882, a corporation called the "Lee Mutual Fire Insurance Association" was duly organized under the laws of this State. Its charter provides as follows :

"SECTION 1. That J. H. Miller, C. H. Clifton, F. M. Goar, their associates and successors, are hereby declared a body corporate to be known, etc.

"SEC. 2. That the objects and purposes of this association are to associate together persons who may desire to assure their property against loss by fire, wind, and lightning, or either, by issuing policies to its members, payable, in the event of loss, on the mutual assessment plan.

"SEC. 3. That the persons named in this charter and their associates and successors shall constitute a board of directors, who shall manage and control the affairs of this association.

"SEC. 4. That the board of directors shall, at their first meeting, after this charter is approved, elect a president, vice-president, and secretary and treasurer, who shall hold their office two years, or until their successors are elected and qualified."

The president and treasurer were executive officers, whose duties were fixed by the board of directors.

With each application for membership and insurance there was required by the by-laws to be paid an advance assessment, a membership fee, and an annual due. On the proof of loss furnished it was the general plan under the by-laws to order a special assessment on all the policy-holders to pay the loss.

On November 24, 1882, a certificate of insurance against loss by fire on a certain gin and appurtenances was issued by this company to J. A. Stewart. This certificate recites that J. A. Stewart "has complied with all the requirements of our association and that he is entitled to the protection of the same to the amount of two thousand dollars on his gin * * * against fire, wind, and lightning, or so much thereof as one assessment on the entire association will pay." On December 27, 1882, the property insured was destroyed by fire. One of the by-laws of the association provided that all certificates of insurance on gins, mills, and

steam machinery be arranged in a separate section from certificates on other property, and that the policy-holders of the " gin " section be " separate and distinct from policy-holders of the other division." Whether this by-law was adopted before or after Stewart's policy was issued is in doubt.

Stewart made proof of his loss, and thereupon an assessment was levied only on the policy-holders of the " gin " section. The proceeds of this assessment, which was only about one hundred and two dollars and fifty cents, was tendered to Stewart, but he declined to receive it, and demanded that an assessment be levied on all the policy-holders of the association. This the directors refused to do. After this refusal W. L. Clayton, who had no interest in the association and was not a director thereof, was elected president of the association. Stewart again made application through Clayton for an assessment to be levied on all the policy-holders of the association for his benefit. The directors again refused. Thereupon Stewart exhibited his bill in the chancery court against the association, W. L. Clayton, president, C. H. Clifton, treasurer, and the sureties on his bond, and the several directors of the association individually. The bill charged that the association, through its officers and directors, had, by refusing to perform their duties and levy an assessment on all the policy-holders of the association personally damaged the complainant; and that certain funds over which complainant had a prior right had been improperly used for other purposes. The prayer of the bill was that the association be compelled to order an assessment of all the policy-holders, that an account be taken and a decree entered against the treasurer and sureties on his bond for such sum as may be found to have been misappropriated, and that a personal decree be given against W. L. Clayton and the several directors for two thousand dollars or for such sum as would be equal to the difference between the value of an assessment then made and now made or to be made. The Chancellor rendered an interlocutory decree for complainant for one thousand one hundred and seventy-five dollars and interest, the amount that was shown would have been raised by an assessment on all the policy-holders had it been made within sixty days after

proof of loss as required, and directed that an assessment be levied by the association on all policy-holders at the time such decree was rendered. This levy was accordingly made and the proceeds, three hundred and seventy-one dollars and nine cents, were paid over to the complainant. The court confirmed the report of such levy and payment, refused to grant complainant any further relief, and he appealed.

The further facts necessary to be stated will be found in the opinion of the court.

*J. A. Blair*, for the appellant.

1. The idea seemed to pervade the minds of counsel in the court below, and it may have influenced the court, that the sole right of complainant was to an assessment, and having got that he was entitled to nothing more; that the directors had a right to pay losses out of the advance assessment or any assessment fund on hand, but that the insured had no right to demand this and no rights or interest in this fund. In a court of law, where only the clear, legal rights are administered, their position would not be disputed, but if recognized in a court of chancery no trust fund could ever be reserved or preserved or administered. In fact, no such thing as a trust fund is recognized at law. At the time of the loss it was true unquestionably that the only right of complainant was to an assessment. He did not get that then; he has never got its equivalent since. The directors had the clear power then to pay the loss out of any assessment on hand, and the question now is will not the court, as the case now stands, *compel* them to do what they had the right to do, and which they now refuse to do, and thereby subrogate the complainant to the rights of the directors as regards the *assessment fund still on hand?* When equity takes jurisdiction for one purpose it takes it for all. Pom. 181, 231, 242; 10 S. & M. 184.

2. Defendant Clayton contends that he is not liable if the balance are; he ratified their act. On the liability of co-trustees: Pom. 1082, 1081, note 2; Thompson 355; Hill on Trustees, top page 470; Duty of Co-Trustees, Hill 478, 843; 2 Hilliard on Torts 292–295; Pom. 1069; Thompson on Liability of Officers and

Agents of Corporations, etc., 353. In the court below it was not contended that Stewart was bound by the gin section if it did not exist at the time he came in. What skill and diligence have been shown in the case then? They say they honestly thought Stewart was in the gin section, and therefore ought to be excused. It was their negligence that prevented them from knowing the exact date.

It seems to us they are liable for the damages caused by the failure to order the assessment, that their defense is not good.

3. The payment of taxes and attorney's fees out of both the advance and special assessment was unauthorized. This whole fund was dedicated to the payment of losses.

The division of the assets on hand arising from annual and semi-annual dues and membership fees among the several directors is too plain a diversion of the funds of the association to require argument.

*Clifton & Eckford,* for the appellees.

1. For the sake of argument we now concede that the by-law in relation to the " gin " section was adopted after the policy was issued. Was the refusal on the part of the directors to make an assessment on the entire membership such negligence and willful misconduct as would make them personally liable for the loss complained of? The directors were quasi trustees for all the shareholders. What degree of diligence were they bound to exercise? They were clothed with discretionary powers to determine whether in a given case the assured was entitled to an assessment. It was through them that the shareholders were to be protected from frauds and imposition. In this very record it appears that these directors declined to make assessments for losses in two or three different cases, thereby saving the shareholders from assessments. Wherever a trustee is clothed with discretion to act, he cannot be held personally responsible for an erroneous exercise of that judgment when honestly made. Morawetz on Private Cor., §§ 243 and 553; Thompson on Officers 356–7, 379; *Spering's Appeal,* 71 Pa. St. 11; *Hun* v. *Cary,* 82 N. Y. 65; *Hodges* v. *Screw Co.,* 53 Am. Dec. 639.

In the construction of charters they are not responsible for an excusable mistake of law. Morawetz on Cor., §§ 557, 559.

Nor are they responsible for an excusable mistake of fact. Morawetz on Cor., §§ 560.

In this case it was a mixed question of law and fact. All of the directors say they thought the assured was in the "gin" section.

2. Passing from this to complainant's right to follow the assessment fund, fasten a trust on it, and charge respondents personally for a diversion of the fund, what interest did complainant have in this assessment fund? He does not seek by his bill to recover the assessments which he has paid into the fund, but modestly asks for it all to be given him.

The plan was mutual, and each shareholder, in common with complainant, had the same rights on the fund that he did. To give it all to complainant would violate the rights of his co-shareholders.

If he could only recover his interest then in the fund at the time of loss an accounting will show that interest to have been less than one dollar. "*De minimum non curat lex.*"

The advance assessment was to pay losses in event the directors did not make a special assessment to meet the particular loss, which was left discretionary with the directors. If a special assessment was made to meet a particular loss, then the advance assessment was relieved of any charge for that loss, and the assured had no rights in it. In this case the special assessment has been made, hence under the contract Stewart has no right to this fund.

But does this trust-feature and a diversion of the trust-fund, independent of the personal liability feature by reason of negligence and willful misconduct, give complainant a cause of action? We submit that this claim can only affect the case to the extent that it may throw light and give character to the act of nonfeasance, in enabling the court to determine whether it constitutes negligence or willful misconduct.

The gravamen of the bill is that the directors failed and refused to make an assessment on all the members by which complainant

was damaged, and that the refusal constituted negligence and willful misconduct, for which they are answerable personally.

Now, if the refusal to make the assessment does not fasten a personal liability on the directors, what right has complainant to fasten a lien or charge on the assessment fund ?

The payment of the taxes and attorney's fees were legitimate disbursements required in order to protect the fund, carry out the policy, and prevent a failure of the trust. *Trustees* v. *Greenough,* 105 U. S. 530–6 ; *Norton* v. *Phelps,* 54 Miss. 472 ; *Shirley* v. *Shattuck,* 28 Ib. 26 ; *Fearn* v. *Mayers,* 53 Ib. 465 ; Pomeroy's Equity 1085 and note 1.

As to the fund lost in the bank, the directors ordered the deposit to be made in the Exchange Bank, and this order was promulgated. Complainant by contract accepted the bank as the depository. It was not known to be insolvent. *Bay View Ass'n* v. *Williams,* 50 Cal. 353.

The fund divided belonged to the directors. There has been no diversion or misapplication of the funds, hence this branch of appellant's case shows that if the discretion of the directors was erroneously exercised it was not from dishonest motives.

*Houston & Reynolds,* for the appellee Clayton.

1. What is the law as to the liability of the officers of a corporation as to its stockholders ?

The law on this subject is digested in a note in 53 Am. Dec. 636, and they, the officers of a corporation, are regarded as trustees or agents of stockholders and creditors, and their liability is to be measured by the law applicable to trustees and agents. Good faith and the exercise of their best judgment is required of them. They are liable for a fraudulent breach of trust or a misapplication of corporate funds ; they are not liable for errors of judgment in the exercise of a discretion confided to them, nor are they liable for the frauds, errors, and embezzlements of each other, each being responsible for his own act.    53 Am. Dec. 639, 640, 641.

2. As to the liability in this case for the refusal to order the assessment for the benefit of appellant.

So far as our client Clayton is concerned, he had no connection

with the company at the time of the first refusal to order the assessment. After his election as president, and when he was applied to to order the assessment for Stewart, he convened the board of directors, and they again refused to make the order, and the by-laws place the president under the *advice* and *direction* of the directors.

There is no liability on the officers for the failure to order an assessment on the whole membership.

The taxes were a lien on the assessment funds, and an appropriation of a part of these funds to their payment was not a misapplication.

3. Clayton had nothing to do with the payment of part of the fees ; they were paid before he was president. The fees with which he was connected were paid to protect the fund out of which it was paid.

The evidence is, that prudent business men in the community deposited their money with the Exchange Bank, and surely the officers of this company would be held to no higher degree of diligence than other prudent business men.

COOPER, C. J., delivered the opinion of the court.

It seems to us more than probable that in the court below the appellant has been treated as occupying some sort of charter connection with the officers and directors of the insurance company, and therefore bound by their acts done in good faith as the acts of his agents. To us it seems manifest that though the company is designated a mutual insurance company, it is in no sense such except that the assured are mutually bound to each other through their connection with the company. By its charter certain privileges are conferred upon the incorporators and their successors, who for the management of their corporate affairs are authorized to make such by-laws as they may deem advisable. But such laws can have no effect to modify contracts entered into by the corporation on the one hand and persons desiring insurance on the other. The price agreed to be paid by the assured for the supposed benefits to be derived from his policy was his pre-payment of one assess-

ment and certain dues and his undertaking to pay subsequent assessments so long as he should elect to retain his connection with the company and through it with other policy-holders. But policy-holders were in no sense members of the insurance company and had no interest in or power over its corporate action so long as it complied with the contract into which it had entered. The company agreed to pay to the appellant the sum of two thousand dollars, or so much thereof as should be realized by one assessment on all the policy-holders in the event of the destruction of his property by fire, wind, or lightning. This it declined to do, but contended that by a by-law of which the complainant had no notice (if, in fact, it existed at the time of the issuance of his policy) he was entitled only to so much as could be realized by an assessment upon a part of the policy-holders who had been assigned to a particular class. If the company by this classification put it out of its power to demand that all policy-holders should submit to an assessment to pay the complainant's loss, it could still have complied with its contract by the payment of the sum named in the policy, two thousand dollars. That the company failed and refused to do either the one thing or the other is unquestioned. It is sought now to escape liability for this on the ground that by such refusal the officers acted in good faith, believing that the company was not liable. If it were true that the directors of the company were the agents of the complainants and other policy-holders, the principle invoked might have application; but it cannot be true that if one party to a contract mistakingly construes it, good faith in so doing will relieve him from executing the contract when construed by the courts. It is manifest that the complainant has not received the benefit of his contract and that there is a liability on the company to respond to him to the full extent of his rights. The company being liable for the unpaid balance of $————, it remains to be determined whether the directors and members of the company who appropriated the assets of the company are personally liable to refund the same, that it may be applied to the payment of the complainant's demand.

The Lee Mutual Insurance Company was organized under a

peculiar charter. It is designated a mutual company, but it has no element of mutuality either in its charter or by-laws. It is in fact a close corporation doing business for the exclusive benefit of its corporators. It would more properly be classed as a joint-stock enterprise, but there were no stockholders for there was no stock. It began business with a charter, a name, and a corps of officers without a dollar of stock paid up or subscribed. It was a mere broker offering to do business in the guise of an insurance company and assuming no obligation that might not be fully discharged by calling upon those who did business with it to subscribe certain sums to the payment of any loss that might occur to any policy-holder, and disbursing the sum so collected. Its liability to personally respond to the policy-holder who sustained a loss was contingent, and depended solely on its failure to perform the duty it undertook to notify policy-holders of a loss, and to receive and distribute the funds which they should contribute to indemnify him who had sustained the loss. The capital of the company consisted of five hundred dollars, which the incorporators advanced to pay the expenses of putting it in operation, and of certain assessments called " dues," which were to be paid by each policy-holder when he took a policy and semi-annually thereafter. This sum was appropriable to the expenses of the concern, and what should remain over was the property of the company, and as such was of course chargeable with its debts. After appellant had sustained his loss, and after he had put the company in default, the officers and corporators of the company divided this fund among themselves, thus stripping the company of its only assets and rendering it insolvent.

At the time of complainant's loss there was a considerable fund in the hands of the company arising from advance assessments paid by the policy-holders. This fund was appropriated by the company to the payment of its privilege taxes, and also to the payment of its attorneys, whom it had employed to defend it against an indictment preferred against it for a failure to pay the tax.

Under a by-law adopted either in 1882 or early in 1883 (there is a conflict of testimony as to the date of its adoption), ten per

cent. of all special assessments made to pay losses was also set apart and used in the payment of the taxes chargeable on the company.

The appellant's claim is that by reason of the distribution of the funds of the company, and by reason of the appropriation of the advance assessments to the payment of taxes and attorneys' fees, and by reason of the application of ten per cent. of the special assessments to the same purpose, the officers of the company are personally responsible to him on his claim. We think this contention not well founded as to the appropriation of the part of the special assessment fund.

In this fund he has no interest. No part of the assessment made for his loss has been so applied. The other special assessments were made for other policy-holders. The other persons may have contracted with reference to the by-law, which appropriated the fund; their contracts or settlements with the company may have been such as to make the appropriation proper and legal. In any event the complainant has no interest in the disposition that was made of it, and if any injury has been done thereby of which any one can complain, the appellant has sustained no loss thereby.

But as to the payment of taxes and attorney fees from the advance assessment, which was appropriable to his demand, we think the appellant may justly complain. In our view the appellant had no interest in the claims to which the fund was applied. The company held itself out to him as lawfully qualified to transact the business it undertook, and payment of these taxes was a necessary step to enable it so to do. It contracted with the appellant to do certain things in consideration of certain fees fixed by itself. If from these fees and others of like character a greater sum had been realized than was necessary to defray all expenses of the company, the gain would have been to the corporators; if it was insufficient, the loss cannot be transferred to the policy-holder, nor paid out of a fund not contributed for that purpose and not owned by the company. We think the directors of the company and its other corporators, to whose use or benefit the advance assessment fund and the fund arising from the dues paid by the policy-holders were disbursed, liable to complainant personally.

First, because they have divided out the assets of the company without having first discharged its legal obligations, and, second, they have appropriated to the payment of debts chargeable only on the company (taxes and attorneys' fees) the money to which complainant had the better right.   The sums thus misappropriated are in excess of the sum needed to satisfy complainant's demand, and he is entitled to a decree against the persons by whom or for whose benefit it was applied.   *Marr* v. *Bank of Tenn.*, 4 Cold. 471; *National Trust Co.* v. *Miller*, 33 N. J. Eq. 155; *Curran* v. *State of Ark.*, 15 How. 304; *Bartlett* v. *Drew*, 57 N. Y. 587.

Neither the sureties on the bond of the treasurer, nor Clayton, the president, are personally liable.   The treasurer as such had no power to direct the application of the fund which he held.   He was subject to the orders of the directors and is protected as treasurer for any disbursement made in good faith under their direction. Clayton, the president, had no interest personally in the company; he received none of the funds distributed, nor were any applied for his benefit.   He was a mere employee of the company and stands in no contract relation with the appellant.

Nor do we think the loss of the fund deposited in the bank can be visited upon the officers or corporators personally.   The bank was in good credit at the time of the deposit, the officers seem to have acted in good faith and as prudent men generally in the community acted in reference to their own funds.

The position taken by counsel for the company that the complainant cannot secure to himself the sole benefit of the fund misappropriated because others are interested therein is not supported by the record.   It is not shown that there are any other creditors of the company, nor that any policy-holder has a claim which will not be met by the plan of assessing other policy-holders according to the practice of the company.

*Decree reversed and cause remanded.*