OKMULGEE WINDOW GLASS CO. v. FRINK.*

(Circuit Court of Appeals, Eighth Circuit. April 25, 1918. On Rehearing,
September 12, 1919.)

No. 5002.

1. PATENTS ⚙⟩215—LICENSE CONTRACT.

A written agreement by complainant to deliver to defendant formal
licenses under certain patents *held* waived, when delivery of licenses
at first was delayed because of some uncertainty as to their date and
later was offered, but not insisted on, and where defendant proceeded
to use the inventions as provided in the contract.

2. CORPORATIONS ⚙⟩580—REORGANIZATION—ACTION ON INDEBTEDNESS OF OLD
COMPANY.

Where a new corporation is in its essence but a continuation of the
activities and interests of the old company, which retains only its fran-
chise as a corporation, a direct recovery is allowable in equity against
the new company upon a contract of the old.

3. CORPORATIONS ⚙⟩617(2)—VOLUNTARY DISSOLUTION—EFFECT ON EXISTING
CONTRACTS.

A voluntary dissolution of a solvent corporation gives no relief from
liability upon existing contracts, whether executed or executory, which
must be satisfied before its assets can be diverted.

4. CORPORATIONS ⚙⟩580—REORGANIZATION—LIABILITY FOR INDEBTEDNESS OF
FORMER COMPANY.

Where a corporation is reorganized by its stockholders merely to
change its situs on removal of its business to another state, the fact that
stock of the new company is to be exchanged share for share for that of
the old does not establish that the net assets acquired are equal in value
to the amount of such stock.

On Rehearing.

5. CORPORATIONS ⚙⟩579(2)—REORGANIZATION—ASSETS OF OLD CORPORATION AS
TRUST FUND FOR PAYMENT OF ITS DEBTS.

Upon the dissolution of a corporation which has ceased to do business,
its stockholders having organized a new corporation to carry on the busi-
ness of the old and to take over its assets, stock being exchanged share
for share, the assets of the old corporation so taken over constitute a
trust fund for the payment of the debts of the former company.

6. CORPORATIONS ⚙⟩580—REORGANIZATION—PERSONAL LIABILITY OF REOR-
GANIZED COMPANY FOR INDEBTEDNESS OF FORMER COMPANY.

Where a corporation has ceased to carry on business and has been dis-
solved, and a new corporation has been organized to carry on the business
and take over its assets, personal judgment may be obtained against it by
the creditors of the former company to the amount of the value of the
property so taken over by the new corporation and converted to its use.

7. CORPORATIONS ⚙⟩579(2)—CREATION OF ENTITY DISTINCT FROM FORMER COM-
PANY—EXTENT OF LIABILITY TO CREDITORS OF FORMER COMPANY.

Where a glass company has ceased to manufacture glass because of the
failure of natural gas in the state wherein it operated, and has removed its
property to another state, where a new corporation is formed by the
stockholders of the old, the property of the corporation being the basis of
capitalization of the new, but some of the old stockholders having sold
all or a portion of their interest in the new corporation, and additional
property has been added thereto, such new corporation is not a continua-
tion of the old corporation, so as to make it identical therewith, and liable
for its debts beyond the value of property received, but is a distinct legal
entity, charged with a limited liability to the creditors of the old corpora-
tion.

⚙⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Further rehearing denied December 15, 1919.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by Robert L. Frink against the Okmulgee Window Glass Company. Decree for complainant, and defendant appeals. Reversed.

William M. Matthews, of Okmulgee, Okl., for appellant.

Frederic O. Berge, of Kansas City, Mo. (N. A. Gibson and J. L. Hull, both of Muskogee, Okl., and E. N. Huggins, of Columbus, Ohio, on the brief), for appellee.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

STONE, Circuit Judge. This is a suit in equity against the Okmulgee Window Glass Company, as the alleged successor of the Coffeyville Window Glass Company, to recover minimum patent royalties under a contract between the Coffeyville Company and appellee, and to have the same "declared to be a lien upon the property and assets of the defendant company at least to the extent of the value of the assets conveyed to it by the Coffeyville Window Glass Company, and that it be ordered satisfied out of the property and assets of the said defendant," and for general relief. Defendant appeals from a decree for $90,560, which was declared to be a lien upon the property and assets of the defendant.

The assigned errors pressed upon this court are: (a) That the appellee neither pleaded nor proved issue and delivery of licenses as required by the contract, but breached the contract by failing to so issue and deliver them, which was a condition precedent to royalty payments; (b) that there was no consolidation, merger, or continuation of the two companies; (c) that no personal judgment should have been rendered against appellant; (d) that the dissolution of the Coffeyville Company terminated the contract; and (e) that the assets acquired by appellant from the Coffeyville Company did not exceed the liabilities of that company assumed and theretofore paid by appellant.

[1] (a) The contract provided for the issuance and delivery, after the payment of $4,500 and "upon the request of the licensee," of licenses of a form attached to the contract. The contract in another clause provided that appellee should place the licenses in escrow in some bank, designated by him, under instruction for their delivery upon payment of the above sum. Appellee executed the licenses but did not deliver them to the licensee or in escrow. The reasons for this failure to deliver were as follows: There arose some question between the parties to the contract as to whether the date thereof should be altered. During this uncertainty appellee wrote to the president of the Coffeyville Company:

"With the exception of filling in the date of the agreement, the licenses are ready for filing at the local bank, and upon receipt of your advices, the proper date will be inserted and papers placed in escrow."

In answer to this the president wrote:

"I note that you say with the exception of the date these agreements are ready for filing, at the local bank and upon receipt of our advice the proper date will be inserted and the papers placed in escrow. Nod (now?) I do not

see a particle. of harm in changing these dates; but as I stated above, do not want to do so on my own authority, without first consulting the others, which I will do now right away and if you are still waiting on me wish you would advise and I will try and give you the information now within the next week or ten days."

To this appellee replied:

"As to the agreement, I appreciate your position relative to this, and think that your consideration of the same is perfectly proper, and inasmuch as there is no particular hurry as to the change in the date of the agreement, this can stand until it is convenient for you to take it up with your colleagues. My only concern relative to it is that it should be thoroughly understood between us, so that you would not, through any misunderstanding, anticipate that there was anything irregular in my not having placed in escrow the patent licenses, as is called for by the agreement. However, I am perfectly willing to issue these licenses, eliminating the date, and give them to you at once, should you so desire, but believe that you have sufficient confidence in me, inasmuch as it is but a minor detail at the most, and we can allow the matter to rest until we have another meeting, at which time we can fill in the dates in these licenses (which are already drawn) and I can then hand them to you complete, for so far as the licenses are concerned, the agreement covers all points as to our respective premises and obligations, and the licenses are of no particular value to you, only in the event that you wish to negotiate with other parties for sublicensing the patents, in which event I will undertake to see that you have the proper authority and credentials to enable you to do so for all territory called for in the agreement."

This status seems to have been understood and acquiesced in by the Coffeyville Company. For months afterwards the correspondence of the parties to the contract shows clearly that they regarded the contract in full force. If the issuance and delivery of the licenses was a condition precedent, it was waived. But it may well be doubted whether such importance is, under the contract, to be accorded them. The first paragraph of the agreement states that the appellee "proposes and agrees to issue licenses under the following patents and pending applications" (setting them out by number and description). The second paragraph provides that:

"The licensor hereby grants, and the licensee hereby accepts, the exclusive right within the territory of the United States west and south of the Mississippi river and to and including the Pacific Coast, to use the inventions set forth in the above identified patents and applications, subject to the terms of this agreement, and licenses under the several patents and applications shall be granted for such territory subject to the conditions set forth herein."

It would seem that the licenses could add nothing to the above positive grant of use of the inventions. A closely parallel case is American Paper Bag Co. v. Van Nortwick, 52 Fed. 753, 757, 3 C. C. A: 274, decided by the Court of Appeals for the Seventh Circuit; Mr. Justice Harlan participating. This contention of appellant is denied.

(b) We have carefully examined the entire evidence, and are convinced that the Coffeyville Company was merged in and absorbed by appellant, which is really nothing more than a continuation of the Coffeyville Company. The arrangement was as follows: The organization by the same individuals of a new company (appellant), with the same amount of capital stock, to be paid for by the assets of the old company (Coffeyville Company), for the sole purpose of continu-

ing the same character of business with the assets of the old company; a transfer to the appellant of the assets of the old company; assumption of the indebtedness of that company by appellant; exchange of stock, share for share. The legal result of such transactions is to impose upon appellant liability, up to the value of such assets, to the creditors of the Coffeyville Company. Kansas City S. R. Co. v. Guardian Trust Co., 240 U. S. 166, 36 Sup. Ct. 334, 60 L. Ed. 579, affirming 210 Fed. 696, 127 C. C. A. 184; Northern Pac. R. Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931; Fogg v. Blair, 133 U. S. 534, 541, 10 Sup. Ct. 338, 33 L. Ed. 721; Union Pac. R. Co. v. McAlpine, 129 U. S. 305, 314, 9 Sup. Ct. 286, 32 L. Ed. 673; Railroad v. Howard, 7 Wall. 392, 19 L. Ed. 117; Jennings Neff & Co. v. Ice Co., 128 Tenn. 231, 159 S. W. 1088, 47 L. R. A. (N. S.) 1058. Also see 7 R. C. L. 182, with citations, and extensive notes to 11 L. R. A. (N. S.) 1119, 32 L. R. A. (N. S.) 616, and 47 L. R. A. (N. S.) 1058.

[2] (c) Appellant objects to the personal judgment against it, contending that judgment should first have been secured against the Coffeyville Company, and then after failure of execution the enforcement of an equitable lien might have gone against it. The rule here invoked is not without recognized exceptions. Where the new corporation is in its essence but a continuation of the activities and interests of the old company, which retains simply its franchise as a corporation, thus becoming practically extinct as an active entity, direct recovery is allowable. See Central of Georgia R. Co. v. Paul, 93 Fed. 878, 35 C. C. A. 639; Hibernia Ins. Co. v. Transp. Co. (C. C.) 10 Fed. 596; Id. (C. C.) 13 Fed. 516; Brum v. Merchants' Mutual Ins. Co. (C. C.) 16 Fed. 140; Harrison v. Union Pac. R. Co. (C. C.) 13 Fed. 522; Altoona v. Richardson, 81 Kan. 717, 106 Pac. 1025, 26 L. R. A. (N. S.) 651; Douglas Printing Co. v. Over, 69 Neb. 320, 95 N. W. 656; Friedenwald Co. v. Tobacco Works, 117 N. C. 544, 23 S. E. 490; Morrison v. Amer. Snuff Co., 79 Miss. 330, 30 South. 723, 89 Am. St. Rep. 598; Howe v. Robinson, 20 Fla. 352, 355. Where it can be thus seen in advance that a judgment against the old company would require the further proceeding against the new company to secure any satisfaction, equity will avoid this useless multiplicity of suits and circuity of action by permitting a direct proceeding. Central Improvement Co. v. Cambria Steel Co., 210 Fed. 696, 705, 127 C. C. A. 184. Here, however, the old company was legally dissolved shortly after appellant took over its business and before this suit was brought. Nor could its assets have been followed into the hands of the former stockholders, because it had none to distribute at dissolution and the shares in appellant which were to have been given these stockholders have never been issued to them—in fact, appellant has refused to issue them, and is now being sued therefor. To deny a direct suit would be to deny all remedy, and this equity can and will avoid. Curran v. Arkansas, 15 How. 304, 310, 311, 312, 14 L. Ed. 705.

[3] (d) Appellant contends that the dissolution of the Coffeyville Company shortly following the merger resulted in the annulment of this contract, in so far as it was executory, and therefore the rule of damages would be such as had accrued up to that time. Such is not

the law. Curran v. Arkansas, 15 How. 304, 310, 14 L. Ed. 705; Broughton v. Pensacola, 93 U. S. 266, 268, 23 L. Ed. 896; Shields v. Ohio, 95 U. S. 319, 324, 24 L. Ed. 357. A voluntary dissolution of a solvent corporation gives no relief from liability upon existing contracts and obligations. As to contracts partly or entirely executory, the dissolution is regarded as a breach, because the corporation has voluntarily incapacitated itself to further perform. The other party to the contract is placed by such act of dissolution in the position of one to whom further performance of the contract has been definitely and finally refused. He can recover for the resulting damage on the entire contract, executory as well as executed. Bowe v. Minn. Milk Co., 44 Minn. 460, 47 N. W. 151; Griffith v. Blackwater B. & L. Co., 46 W. Va. 56, 61, 33 S. E. 125, 127; Musgrove v. Gray, 123 Ala. 376, 26 South. 643, 82 Am. St. Rep. 124. Also see Schleider v. Dielman, 44 La. Ann. 463, 10 South. 934; Tiffin Glass Co. v. Stoehr, 54 Ohio St. 157, 43 N. E. 279. The assets of the company must satisfy such liabilities before they can be diverted. There can be no doubt here that the proven damage is far in excess of the assets received by the appellant and not already devoted to payment of Coffeyville Company indebtedness.

[4] (c) The contention that the assets acquired from the Coffeyville Company were equaled by the debts assumed and heretofore paid, so that there is no surplus to which this debt might attach, is a question of fact. It has required and received a painstaking examination of the entire evidence. The view of the trial court seems to have been determined by the circumstance that the appellant was, after taking over the assets and assuming the indebtedness, to exchange its capital stock of $100,000 for that of the Coffeyville Company. He takes this as an admission that the value of the net assets was $100,000. In our judgment, the force of this view is broken by the following considerations: In these transactions the stockholders of the one company were the organizers and stockholders of the other. They bought from themselves. There was present none of those considerations which contribute to a fair determination of value. What the parties had in mind was a change from a Kansas corporation, doing business in Kansas, to an Oklahoma corporation, with the same capitalization, doing the same business in Oklahoma. A geographical change in the business made it desirable to make a similar corporate change. Eliminating this factor of capitalization, the record is fairly clear as to the value of these assets with the exception of two items, concerning which there is no helpful information in the evidence. At the time the Coffeyville plant was moved to Okmulgee, the latter city gave a bonus of a building site and $20,000 in notes. Of the notes approximately $10,000 worth have been paid. The balance are probably overdue, and there is no evidence as to what, if any, value they have. There is also a singular absolute silence as to the character of title to the site—upon what, if any, conditions it was given or what value it carries. Because of this uncertainty we have been reluctantly compelled to exclude these two items. Computation of all other items touching the assets acquired from and the liabilities already paid for the Coffeyville Com-

pany results in assets of $114,689.82, ·liabilities of $95,278.96, net assets, $19,410.86.

Therefore the case will be reversed, with instructions to enter decree for appellee for the sum of $19,410.86 and costs, which judgment shall be a lien upon all of the property and assets of the appellant.

On Rehearing.

Before. HOOK and CARLAND, Circuit Judges, and YOUMANS, District Judge.

YOUMANS, District Judge. A rehearing in this case was granted upon the petition of appellee and the case has been resubmitted. Confusion has resulted by reason of a change of theory on the part of counsel for appellee since the decision of this court on the former submission. They have taken certain expressions in the former opinion which were made with regard to the position then maintained by them, and now make those expressions the basis for an entirely different position.

The amended bill of complaint was framed on the trust fund theory. That theory was adhered to by counsel for appellee on the former submission. Their contention was stated on pages 63 and 64 of their original brief as follows:

"The liability of the Okmulgee Company arises in the following way: The stockholders, directors, officers, and owners of the two corporations being identical, on the dissolution of the Coffeyville Company, became trustees for the creditors of that corporation and as such held its property in trust; and when this property was turned over by them to the Okmulgee Company, which they had organized to take and hold the property for their benefit, the Okmulgee Company, having full knowledge and notice of the trust imposed upon. the property and the former trustees, and of the contract with Mr. Frink, became the successory trustee for the creditors of the Coffeyville Company.

"Furthermore, the property having been so taken without the payment of anything therefor to the Coffeyville Company, and without the payment of all claims of creditors of the Coffeyville Company, and having been so taken. impressed with a trust and with full knowledge and notice thereof, then, at such time as it repudiated Mr. Frink's claim and prior right to have his claim satisfied out of the Coffeyville property, the Okmulgee Company, as such successory trustee, committed a breach of trust and became liable to be called to account for such trust property, at least to the extent of the value of the property so taken.

"Furthermore, the Okmulgee Company, as such successory trustee, having commingled trust property so taken with property of its own, and all now a constituent of and used by it as one entire plant and property, so that the original Coffeyville property has lost its separate identity, it has thereupon become liable to satisfy Mr. Frink's claim, arising out of his contract with the Coffeyville Company, in a direct personal judgment. Furthermore, the Okmulgee Company, having so taken the Coffeyville property with full notice and knowledge of its trust character, and with full notice and knowledge that the persons from whom the property was so received held it as trustees, thereupon stepped into the shoes of the former trustees and became the successory trustee for the creditors of the Coffeyville Company, with plenary notice that the interest of Mr. Frink in the property, as a creditor of the Coffeyville Company, was at least as much as the value of the stock of the Okmulgee Company, or the interest claimed therein by its stockholders, plus the indebtedness which the Okmulgee Company had assumed in taking over the property."

With regard to the amount of the recovery by appellee the contention of his counsel on the former submission is indicated by the following quotations from their original brief. On page 68 they say:

"The measure of Mr. Frink's recovery against the Okmulgee Company, under the circumstances of this case, is the value of his equity as a creditor of the Coffeyville Company, which was diverted from him as such creditor by the Okmulgee Company as successory trustee; and this would be so even as under the circumstances of this case, where it is claimed that the Okmulgee Company paid debts of the Coffeyville Company, to an amount alleged to be in excess of the value of property so taken, particularly where such alleged value as in this case was arrived at or determined arbitrarily by the parties who have benefited by the arrangement, and a long time after the property has been so transferred."

On page 69 they say:

"As a general proposition Mr. Frink probably would be limited to the subjection of the property transferred, and the Okmulgee Company would be liable only to the extent of the value of the property taken. However, where, as in the circumstances of this case, in moving the property from Coffeyville to Okmulgee, the Coffeyville Company's property got mixed up with the individual property of Dr. Skelton and into the plant that he was constructing, and where, in reconstructing the original Coffeyville plant at Okmulgee new material was added, and the reconstructed plant was enlarged by one-third over the old Coffeyville plant at Coffeyville, such mixing and intermingling of property having been brought about by the stockholders as trustees and the Okmulgee Company, which took over the property for their benefit as successory trustee, and where thereafter the Okmulgee Company took over the property of the Skelton plant and thereupon increased its capital stock to $200,000, and at the time this action was begun all of this property, including the original Coffeyville property, was a constituent part of one entire plant, and so used by the Okmulgee Company as one entire plant and property, then under such circumstances Mr. Frink is not limited to the subjection of the property so taken, but this court sitting in equity has plenary power to so conduct its proceedings and mold its decrees that full relief may be secured to Mr. Frink."

On page 70 they say:

"However, assuming for the sake of argument that Mr. Frink should be limited in his right to proceed against the property taken over by the Okmulgee Company, this would be of no material benefit to it, as the property was worth very much more than Mr. Frink's claim."

Curiously enough counsel for appellee cite in support of their contentions, so carefully and elaborately set forth, the very same authorities which they now construe to sustain a theory of personal and direct liability on the part of the Okmulgee Company.

On the former submission this court accepted the trust fund theory on which appellee based his claim, as indicated by the foregoing quotations, but did not take the same view of the testimony as was taken by counsel for appellee, nor did it accept the interpretation of the law urged by them for the determination of the amount of his recovery.

On this submission counsel for appellee seek to hold the judgment recovered by him in the court below upon the theory of direct liability. They now say that they might have brought this suit at law, and that the decision of this case should rest on principles applicable

in cases of personal liability. On page 2 of their petition for rehearing they say:

"On the facts in this case, the decision does not rest on the trust fund doctrine, but is bottomed on *principles of direct liability as effectively as though the Okmulgee Company had itself signed the contract with Mr. Frink.*"

This is a complete change of front. The time of the change appears on page 4 of the petition for rehearing. Counsel there say:

"We have diligently studied these cases and the record for over four years, and have only come to appreciate the full force and effect thereof since reading the opinion of this court."

On page 8 of the petition for rehearing they say:

"On the facts of our case, we *might have sued at law*, and the decision should rest on principles applicable in cases of personal and direct liability."

The fact is that they did not sue at law, and if they had based this suit on the theory of personal and direct liability they would have had no standing in equity. Counsel for appellee now say that the authorities sustain the direct liability theory in cases similar to the case at bar. We do not so read the cases. It is true that personal judgments have been rendered in such cases, but such judgments are based on the existence of a trust fund and on the disposition, misapplication, or conversion of such fund. Moreover, such judgment cannot exceed the amount of the fund.

That was the conclusion of this court upon the former submission. After reciting the facts Judge Stone, speaking for the court, said:

"The legal result of such transactions is to impose upon appellant liability, up to the value of such assets, to the creditors of the Coffeyville Company."

Counsel for appellee now contend that the cases cited in support of that conclusion sustain the theory of direct liability, without regard to the value of the property received. That contention makes a reexamination of the controlling decisions necessary.

In the case of Hibnernia Ins. Co. v. Transportation Co. (C. C.) 10 Fed. 596, 599, the court said:

"A corporation, having incurred liabilities, is dissolved, practically, by transferring all its property to another corporation, formed possibly for the very purpose of leaving the creditors of the former (creditors at large) without any adequate means of realizing their just dues. * * * If the new corporation knew, as charged, that the demands against the old were outstanding, and with that knowledge received all the property of the old corporation without consideration, why should it not be held to have acquired that property cum onere? * * * Here it is charged that the new corporation took all of the property of the old without consideration, charged with full notice of plaintiff's demands, and therefore, as to this plaintiff, fraudulently. It may be that serious embarrassments will ensue, pending the litigation, if the lis pendens is to hang over the new corporation concerning its rights in the transferred property. Of course, it is answerable to plaintiff's demands only to the extent of the property received; and if any serious detriment as to the use or disposal of the same should arise, the court is open for such orders as may preserve the rights of the parties pending the litigation."

In the case of Harrison v. Union Pacific Railway Co. (C. C.) 13 Fed. 522, 525, the court said:

"The cross-bill alleges and the demurrer admits that the Consolidated Company has received from the Kansas Pacific Company all its property, amounting to more than $10,000,000, and that the original corporation has practically ceased to be, and is merged in the Consolidated Company, having now no officers upon whom service can be made, and no property out of which an execution can be satisfied. We are of the opinion that, under such circumstances, the Consolidated Corporation is liable in equity for the debts of the original corporation, at least to the extent of the value of the property received from it."

In the case of Brum v. Merchants' Mutual Insurance Co. (C. C.) 16 Fed. 140, 143, the court said:

"As the Home [Insurance Company] took all the property of the old company, leaving nothing to pay the amounts due libelants, and as it took them, not as creditors, but as owner, it seems clear to me that it must pay the debts of the old company, at least to the amount of the assets converted."

The point involved here was fully discussed in three opinions in the case of Boyd v. Northern Pacific Railway Co. A very painstaking opinion was written by District Judge Whitson, who tried the case. It is reported in 170 Fed. 779. On page 794 he said:

"Complainant's counsel invoke the doctrine of equity that the assets of a corporation constitute a trust fund for the payment of its creditors. This, of course, is not disputed, but a distinction is pointed out between the personal liability of a transferee in such a case and the right of a creditor to follow the property transferred. Thus the defendants' position is stated:

" 'When, on October 1, 1888, the Cœur d'Alene Company leased its property for 999 years to the railroad company, the rights of the creditors of the former company as against that property remained just what they were before. The Cœur d'Alene Company could not diminish or impair those rights by making the transfer, and the property remained subject to the claims of creditors upon it; and if at any time prior to 1893 the plaintiff had pressed his claim to judgment the property could have been sold (subject to mortgages upon it, but freed from the lease) to satisfy that judgment.'

"If counsel have appeared to dispute concerning the rule, it may be gathered from the briefs that there is no substantial controversy between them. Defendants' counsel admit that the transferee of the property of a corporation is liable to account to the creditors of the transferring company, but limits the remedy to the property transferred, while complainant's counsel apparently have not intended to be understood as claiming a liability for the payment of indebtedness beyond the assets taken over. But, if they have been misunderstood in that regard, it must be held that there is no personal liability, except where property has been disposed of, misapplied, or converted. The general trust doctrine would not permit of a more extended application, but the personal liability of one who fails to observe the duty imposed, when the assets of a corporation come into his hands, is abundantly sustained by authority."

In the same case in the Circuit Court of Appeals for the Ninth Circuit, 177 Fed. 804, 820, 101 C. C. A. 18, 34, Circuit Judge Gilbert, speaking for that court, said:

"The purpose of the present suit is to deprive one of the parties to the foreclosure suit of a benefit which it derived under the decree therein. It is to require the railway company, which obtained the property as a result of the decree and the agreement and understanding of the parties whereon it was based, to devote a portion of the property so obtained to the payment of the

claim of one who was equitably entitled to receive the same out of the property so transferred."

Upon one branch of the same case (228 U. S. 482, 500, 33 Sup. Ct. 554, 559 [57 L. Ed. 931]) Mr. Justice Lamar, speaking for the Supreme Court, said:

"Being liable for this diversion of $465,000, the Northern Pacific Railroad remained so liable until the funds were restored to the true owner."

Upon another branch of the case (228 U. S. on page 508, 33 Sup. Ct. 561 [57 L. Ed. 931]) he said:

"If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever."

In the case of Central Improvement Co. v. Cambria Steel Co., 201 Fed. 811, 822, 120 C. C. A. 121, 132, this court said:

"But a sale or transfer by stockholders of the property of their corporation in which they preserve an interest, whether that sale or transfer be by deed, by mortgage, by judgment, by foreclosure sale, or by any other means, is fraudulent and voidable against the unsecured creditors of their old corporation, and a purchaser who takes and converts such property to its own use with knowledge of the facts becomes legally liable to pay the unsecured debts of the old corporation, at least to the extent of the value of the property so taken and converted."

In the same case (210 Fed. 696, 703, 127 C. C. A. 184, 191) this court said:

"Moreover, the property of the Belt Company was a trust fund. The stockholders of that company were trustees charged with a duty to apply that property to the payment of the claims of the Trust Company and of the other creditors of the Belt Company before they took to themselves any share in or benefit therefrom. When the Southern Company took their stock and gave them $4,750,000 par value of its stocks and bonds for their interest in the property of the Belt Company, it stepped into their shoes and became a trustee for the creditors of the Belt Company, with plenary notice that the interest of those creditors in the property was at least as much as the value of the stocks and bonds it was giving for the interest of the stockholders, for the rights of the creditors in the Belt property were prior and superior to those of the stockholders."

On page 706 of 210 Fed., on page 194 of 127 C. C. A., in the same case, this court said:

"Moreover, where the property of a corporation is sold to a purchaser, and part or all of the purchase price thereof is paid or distributed to its stockholders, to the exclusion of its creditors from a collection of their debts from the property of the corporation, the latter may recover that part of its value from the purchaser with notice, on the ground that the conveyance is fraudulent in law."

In the same case, on page 709 of 210 Fed., on page 197 of 127 C. C. A., that court quoted from the opinion in Clements v. Moore, 6 Wall. 299, 312, 18 L. Ed. 786, as follows:

"A sale may be void for bad faith, though the buyer pays the full value of the property bought. This is the consequence, where his purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys reck-

lessly, with guilty knowledge. When the fact of fraud is established in a suit at law, the buyer loses the property without reference to the amount or application of what he has paid, and he can have no relief either at law or in equity. When the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to—while it scans the transaction with the severest scrutiny—looks at all the facts, and, giving to each one its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in an action at law. In others, it allows a security to stand for the amount advanced upon it. In others, it compels the buyer to account only for the difference between the underprice which he paid and the value of the property. In others, although he may have paid the full value, and the property may have passed beyond the reach of the process of the court, it regards him as a trustee, and charges him accordingly. Where he has honestly applied the property to the liabilities of the seller, it may hold him excused from further responsibility. The cardinal principle in all such cases is that the property of the debtor shall not be diverted from the payment of his debts to the injury of his creditors, by means of the fraud."

In the case of Kansas City Railway v. Guardian Trust Co., 240 U. S. 166, 173, 36 Sup. Ct. 334, 335 (60 L. Ed. 579), the Supreme Court, speaking through Mr. Justice Holmes, says:

"The Court of Appeals thought it plain that the foreclosure was part of the original plan; and, as it also thought that the mortgaged property was worth enough above the mortgage to pay the unsecured creditors, it held that the stockholders when receiving pay for their stock were receiving it in substance as the proceeds of a transaction that removed all property of the Belt Company from its unsecured creditors' reach."

[5] These authorities fully sustain the view that all the property that came into the hands of appellant belonging to the Coffeyville Window Glass Company constituted a trust fund for the payment of the debts of the latter company.

[6] They also sustain the view that, the appellant having converted that property to its own use, personal judgments may be obtained against it by creditors of the Coffeyville Window Glass Company to the amount of the value of the property.

[7] The testimony does not warrant the finding that appellant is a continuation of, nor merged into, the Coffeyville Window Glass Company, in the sense that would make the latter identical with the former, and the former liable for the latter's debts beyond the value of property received.

The Coffeyville Window Glass Company ceased to manufacture glass at Coffeyville on account of the failure of natural gas. It removed all of its property that could be removed advantageously to Okmulgee, Okl., where natural gas could be obtained. Its stockholders organized an Oklahoma corporation. The property of the Kansas corporation constituted the basis of capitalization for the Oklahoma corporation. The Kansas corporation was then dissolved. Some of the old stockholders sold all or a portion of their interest in the new corporation. Additional property was added which was made the basis for an increase of stock. The Oklahoma corporation became a distinct legal entity, charged with a limited liability to the creditors of the Kansas corporation.

There was no express assumption by the Oklahoma corporation of appellee's debt, nor does the testimony warrant the finding that there was an implied assumption. On the contrary, the testimony of appellee himself is to the effect that appellant refused to recognize his contract, or to pay the amount that had accrued thereon.

Otherwise than as qualified herein, we are satisfied with the language of the former opinion, and after full consideration agree with the result there stated, except that we are now convinced that appellee is entitled to a personal judgment only, and not that such judgment should be declared a lien on appellant's property.

Therefore the case will be reversed, with instructions to enter a decree for appellee for the sum of $19,410.86 and costs. It is so ordered.