PRUDENTIAL LOAN COMPANY, A MINNESOTA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78869. Promulgated June 1, 1938.

*Walter H. Newton, Esq.,* and *L. A. Gravelle, Esq.,* for the petitioner.
*G. W. Brooks, Esq.,* and *Alvin Pierson, Esq.,* for the respondent.

OPINION.

OPPER: Respondent urges three grounds for sustaining his determination: First, that the sale of Western Bond stock by petitioner was in fact not what it appears to be, and should be treated as a nullity and entirely disregarded; second, that this stock became worthless in a prior year and no loss is allowable for the year 1929; and, third, that the loss if otherwise proper is not deductible since it was not attributable to the petitioner's regular business.

It is not entirely clear upon what ground respondent urges that the transaction was not in fact a sale. There is some intimation that the original contract, being designed to "segregate" the individual and corporate assets, could not at the same time be a contract to sell by the respective parties. No authority is cited for this proposition and we are unable to reach that result upon an analysis of the actual agreement.

The parties were dealing with four items of property in arranging for segregation—the Western Bond and Investors Syndicate stock owned by or attributable to the Farringtons, and the corresponding stock controlled by the Ridgeways. As to two of the four items the arrangement was merely to leave the situation undisturbed; the Farringtons were to retain their Western Bond holdings, the Ridgeways to keep their Investors Syndicate stock. As to the Investors Syndicate stock of the Farringtons, the full cash value was to be paid to them by or through Ridgeway. There thus remained the Ridgeway share of Western Bond, which had to pass to Farrington. And the only remaining consideration—which moved from Farrington to Ridgeway—was the agreement to relieve Ridgeway of liability on the $10,000 note. It seems to us that this was similar in legal effect to an agreement to sell the Western Bond stock in consideration of the worth of Ridgeway's release. "In a general and popular sense, the sale of an article signifies the transfer of property from one person to another, for a consideration of value, without reference to the particular mode in which the consideration is paid." *Howard v. Harris*, 8 Allen, (Mass.) 297, 299; *Betty Rogers*, 37 B. T. A. 897.

We are the more fortified in this result by the circumstance that when these same facts were before the Board in connection with Farrington's tax liability arising out of the identical transactions, we found that the transfer of the Western Bond stock to him was in fact a sale.[1]

No claim is made that the organization of petitioner lacked a true business purpose nor that for any other reason the provisions of section 112 of the Revenue Act of 1928 are inapplicable. Cf. *Gregory v. Helvering*, 293 U. S. 465. In our consideration of these questions we are therefore justified in accepting as a premise that the organization of petitioner and the transfer to it of all of the assets of Prudential constituted a "tax free" reorganization. This much appears to be conceded by respondent. Petitioner was thus, for purposes of determining basis and depreciation of transferred assets, in the same position from a tax standpoint as its predecessor. *Mente & Co.*, 24 B. T. A. 401; *T. H. Symington & Son, Inc.*, 35 B. T. A. 711; *Ahles Realty Corporation* v. *Commissioner*, 71 Fed. (2d) 150.

The remaining question under this contention accordingly appears to be whether the Western Bond stock was in fact among the assets transferred by Prudential to petitioner, for if it was, and, except for respondent's third contention, it seems to follow that petitioner must be entitled to deduct the same loss that Prudential could otherwise have deducted. To resolve this question we may consider, first, whether at the time Ridgeway and Farrington entered into their contracts the stock was in reality the property of Prudential; and, second, if it was, whether in reality it ceased to be an asset of Prudential before the transfer to petitioner.

There can be no dispute that in all outward aspects the Western Bond stock had been consistently treated as belonging to Prudential. The latter was the record owner. It received the dividends. It carried the stock on its books. Nor is it suggested that the corporation was a mere shell and not an actively functioning entity. We find no evidence that its apparent ownership was not real. True, the original contract for the sale of the stock was made by Ridgeway and not by Prudential; and the benefit of the sale as originally contemplated, that is, the liquidation of the Mildred Farrington note, was obviously to be derived by Ridgeway and not by Prudential, since the former and not the latter was the obligor on the note. But it seems to us this demonstrates no more than a recognition by the parties that their control of Prudential made its technical concurrence a foregone conclusion. We are not justified for this reason alone in assuming that the property did not belong to Prudential. *Blue Line Holding Co.*, 33 B. T. A. 694.

---

[1] *C. H. Farrington*, Docket No. 76847 (memorandum opinion, Feb. 5, 1936).

Although not specifically so stated, respondent's position may be that title to the stock passed from Prudential to Farrington by virtue of the contract, and hence that no transfer to petitioner or sale by it could have taken place later. With this position we should be unable to concur. That title to ascertained personal property may pass without delivery must be conceded. *Dee Furey Mott*, 35 B. T. A. 195; *Hoffman* v. *Commissioner*, 71 Fed. (2d) 929. But whether in any such circumstances title actually passes is a question of intent. *Hoffman* v. *Commissioner, supra; Consolidated Utilities Co.* v. *Commissioner*, 84 Fed. (2d) 548. And, in the absence of evidence to the contrary, it will be presumed that title was not to pass until consummation of the contract. *Consolidated Utilities Co.* v. *Commissioner, supra.* Here, if anything, the intention not to pass title is emphasized. Provision for escrow of other stock dealt with by the parties is specifically included in the "Sales Agreement." No such specific provision was made for the Western Bond stock, but, as respondent states in his brief, "Isaacs [one of the attorneys] was to hold the stock pending performance of the Contract", and two certificates representing part of the stock "were given by Ridgeway to Isaacs on January 19, 1929, immediately following the conference between Ridgeway and Farrington in Minneapolis when the General Contract was signed." This was rather an indication that the stock was to be withheld from Farrington in the meantime than that title had passed. See *Ganson Depew*, 27 B. T. A. 515, 522; *Grand Rapids Trust Co. et al., Administrators*, 34 B. T. A. 170, 172. Farrington delayed action on the Mildred Farrington note, and, pending this, the stock was not delivered. On August 20, 1929, Ridgeway wrote to Jacob, another attorney: "The Prudential Loan Co. of Minnesota nor I have received check from Mr. C. H. Farrington for Western Bond and Mortgage Co. stock. Please advise when this deal will be definitely consummated." Correspondence and action of the parties are consistent with an intention that passage of title to the stock was conditioned upon prior or simultaneous payment, and cast serious doubt upon any other interpretation. Certainly there is no evidence that immediate passage of title was intended. Cf. *Hoffman* v. *Commissioner, supra.* And payment was not made until October, so that the actual sale took place many months after the February transfer of the stock from Prudential to petitioner.

It follows from this that the further provision for retention of the stock by Ridgeway "to offset earnings for the purpose of income tax" was inconsequential. Its only effect could have been to prevent a passage of title which would otherwise have taken place. For that purpose, as we have seen, it was unnecessary, for the result was reached by other factors, and would have been, in any case. What the conclusion would be if the arrangement had been a mere colorable attempt

to disguise a contrary situation we are not called upon to decide. Cf. *Clara Brunton, Executrix*, 15 B. T. A. 348; *William Holden*, 6 B. T. A. 605.

It is true that, although insufficient to pass title, the contract created an unqualified obligation to sell the stock to Farrington, and no one else. But that is what made it a contract to sell, rather than a mere legal nullity. It may also be assumed that Ridgeway's agreement that the stock would be sold was binding on Prudential, even in the absence of specific corporate action, see *Vawter* v. *Rogue River Valley Canning Co.* (Ore., 1928), 262 Pac. 851; *Wenban Estate, Inc.* v. *Hewlett* (Cal., 1924), 227 Pac. 723; *Kentucky Coal Lands Co.* v. *Mineral Development Co.*, 295 Fed. 255; and that, the stock having been acquired by petitioner under the circumstances before us, petitioner in turn became bound to perform. See *Okmulgee Window Glass Co.* v. *Frink*, 260 Fed. 159; *Grand Rapids Trust Co. et al., Administrators, supra*, p. 172; *Dairy Co-Operative Association* v. *Brandes Creamery* (Ore., 1934), 30 Pac. (2d) 338; *American Bank* v. *Port Orford Cedar Products Co.* (Ore., 1932), 12 Pac. (2d) 1014. This situation gives point to respondent's suggestion that Farrington's offer in September to buy the stock from petitioner was an empty formality. But this would be so not because such a transaction would do violence to the facts, but, on the contrary, because it was so much in accord with them that petitioner was already effectively disabled from refusing to perform. If we are correct in this, the delivery of the July dividend check to Prudential instead of to petitioner is of no importance. It could have been nothing more than an immaterial oversight. And the fact that the petitioner at the time it received the stock was contractually bound to make the sale would not permit us to disregard the sale and relieve petitioner of the consequences of any ensuing profit. No more does it require disallowance of the loss. *J. Hampton Hoult*, 24 B. T. A. 79; *E. F. Simms*, 28 B. T. A. 988.

As to the claim that the stock was worthless, Farrington, who of all men was in a position to know, dealing voluntarily and at arm's length with Ridgeway, suffered a detriment by undertaking the full responsibility on the Mildred Farrington note. This liability was assumed in exchange for nothing, unless it was the Western Bond stock and unless that stock had some value. The company was a going concern; it showed a book surplus; and it stood, through the operation of the very transaction before us, to receive $200,000 in cash and notes as a contribution to its capital. Under these circumstances we can not find that the stock had no value. It may be that the precise "market value" of these securities in 1929 was difficult to estimate, or indeed that sales were so infrequent that they had no "fair market value." But this is not to say, in the face of the record, that they were "worth-

less." "Such shares may have intrinsic value, but * * * no 'fair market value.'" *Mount* v. *Commissioner*, 48 Fed. (2d) 550.

It should be emphasized that here is not an instance of a private sale asserted by respondent to be at an unduly low figure, thus enabling the vendor to establish an excessive tax loss. Respondent's contention is that the valuation here was too high, since the stock was worthless. We can not agree that it was entirely worthless, and if it was in fact not worth quite as much as Farrington agreed to pay, an assumption it is difficult to make, the only tax result is that petitioner has taken a smaller loss than that to which it might otherwise have been entitled. Nor has petitioner attempted to escape its fair share of the consideration paid for the stock, and thus to increase its loss. That proportion of the $10,000 payment which is apparently to be ascribed to the stock owned by petitioner was in fact received by it and deducted from its basis. Had the parties followed the precise terms of the original contract and canceled the note, thus leaving Ridgeway with the proceeds of petitioner's asset, it might have been necessary to conclude that part of "the money belongs to the petitioner and is held in trust for it by its stockholders", *Garrison Brothers State Bank* v. *Commissioner*, 67 Fed. (2d) 486, 487; and to charge petitioner with constructive receipt of part of Ridgeway's benefit, since "the fact that petitioner did not take action to recover the proceeds from its stockholder does not relieve it of liability for the tax." *Blue Line Holding Co.*, *supra*, p. 699. That this was avoided by the ultimate form of the transaction, with the result of a direct payment to petitioner of the value of its stock, seems to us to enhance, not diminish, the reality of its loss.

Nor can we agree that the disputed sale was not attributable to the operation of the petitioner's regular business. Its "Articles of Incorporation" authorized it to deal in securities and it did in fact engage in other securities transactions. It does not appear to be contested that petitioner was organized to continue the business of Prudential and that it did so. Had Prudential sold the Western Bond stock, which it was created, in part, to hold, we do not see how it could be doubted that it would thereby be engaging in its regular business. We think the same conclusion follows as to petitioner.

Finally, we can not refrain from an expression of our belief that characterization of the facts before us as "tax avoidance" is not peculiarly fortunate. The actuality of the economic loss sustained can not in fairness be disputed. Nor, it seems to us, is there justification for regarding the organization of petitioner, the transfer of assets, and the dissolution of Prudential, as actuated primarily, if at all, by tax motives. Cf. *C. A. Bryan*, 19 B. T. A. 111. Had Prudential continued to exist it could have sold the stock and offset the loss against its income with virtually identical tax results. Clearly,

then, no consequential tax advantage was to be anticipated from the proceedings regarded as a whole. That petitioner should derive the benefit of Prudential's potential deduction, having succeeded to its property and income, is the essential justification for invoking the protection of section 112 "in order that ordinary business transactions will not be prevented on account of the provisions of the tax law." H. R. Report No. 179, 68th Cong., 1st sess., p. 13. And if the parties took pains to make the actual transaction apparent by its ultimate form they are no more to be penalized than, in the converse situation, a taxpayer is to be protected when he attempts to conceal the true facts by a misleading disguise. "To hold otherwise would be to exalt artifice above reality  *   *   *." *Gregory* v. *Helvering*, *supra*.

*Decision will be entered under Rule 50.*